UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X

UNITED STATES OF AMERICA,      :
      :
      :
v.      :    Case No. 1:24-cr-00051-PKC
      :
Mohanad Al-Zubaidi, *et al.*,      :
      :    **DEFENDANT SHAKER SALEH**
      Defendants.    :    **MOHAMMED HAUTER'S**
      :    **SENTENCING MEMORANDUM**

------------------------------------------------------ X

Dated:    April 8, 2025        Respectfully Submitted,


By: /s/Tillman J. Finley
Tillman J. Finley
MARINO FINLEY LLP
818 Connecticut Ave., NW, Suite 801
Washington, D.C.  20006
Telephone: (202) 223-8888

## I.     Introduction

Mr. Hauter is a 52-year-old, beloved father and grandfather who has lived a good, hard-working, law-abiding, and satisfying life in New York since coming to the United States from his native Yemen as a young man nearly 30 years ago.  He is loved and respected in his local community, known for his generosity and his willingness to help others.  He has been a good husband and a good father, in particular to his 10-year-old autistic son with whom he has a special bond and in whose care and support Mr. Hauter has played a crucial role.

Mr. Hauter has now been away from his family for nearly 15 months since his arrest on February 1, 2024.  It has been a very hard 15 months.  Mr. Hauter's wife, ex-wife, and young children have all had to rely on the support of Mr. Hauter's adult children to weather the storm, both financially and emotionally.  Mr. Hauter's 15-year-old daughter has switched to an online school so that she can remain at home to assist her mother (who speaks little English) and help care for and support her younger siblings—in short, to fill many of the roles left empty by her father's absence.  They all miss him greatly, the youngest not even knowing or understanding why he has been gone for so long.  Meanwhile, Mr. Hauter spent more than seven months experiencing first-hand the conditions that have made the Metropolitan Detention Center in Brooklyn a notorious failure of the American criminal justice system.  During his time there, he was the subject of repeated extortion attempts accompanied by threats to himself and his family, physically assaulted in his cell, and twice moved to the Special Handling Unit for his protection.

Mr. Hauter has pled guilty to conspiring to operate an unlawful money transmitting business, a conspiracy in which he became involved when his work as a black-car and limousine driver evaporated overnight following the onset of the COVID-19 pandemic.  Mr. Hauter knows and understands this was against the law, and for good reasons.  That being said, the informal

2

system of money transfer with which Mr. Hauter became involved operated within the American Yemeni community, helping people send crucial funds to their friends and family suffering as a result of the Yemeni civil war and the oppressive and destructive actions by the Houthis who control so much of that country now. The funds Mr. Hauter and others transferred were part of the billions of dollars of foreign remittances that have been going to Yemen each year for more than a decade. There is no evidence in this case that any of the funds transmitted as part of Mr. Hauter's conduct were not delivered as promised, or that the transfers involved the proceeds of unlawful activity or were to be used to further any unlawful activity abroad. That certainly was never Mr. Hauter's desire or intention.

Mr. Hauter's own purpose was merely to support himself and his family financially while doing something that appealed to his longtime interest in being active in the Yemeni immigrant community and helping others, both in New York and in his native Yemen. While Mr. Hauter took a commission, none of this made him wealthy or was used to fund lavish expenditures. Indeed, during much of the time at issue Mr. Hauter also worked operating markets in his Little Yemen neighborhood to support his family. Mr. Hauter knew that the people in his community relied on this system to get money to their friends and relatives in Yemen, who were trying to make their way in a chaotic and impoverished country suffering under the erratic and destructive rule of the Houthis. He gained satisfaction knowing that his efforts helped alleviate at least some of the suffering of the Yemeni people.

This does not excuse his unlawful conduct, but it does place in context where Mr. Hauter's heart and spirit ultimately are—*i.e.*, in his faith, in his family, and in his community. Mr. Hauter is a good man, who has earned the love and respect of his community by being upright, reliable, and generous. The nearly 15 months Mr. Hauter has already served (roughly half of that under

3

dangerous conditions at MDC) are more than sufficient punishment for his crime. The purposes of sentencing under 18 U.S.C. § 3553(a) are more than accomplished by a sentence of time served. Nothing further would be accomplished by prolonging Mr. Hauter's imprisonment; instead, doing so would only further injure the family and community which Mr. Hauter serves.

## II.    Mr. Hauter's History and Characteristics

### A.    Youth and Early Years

Mr. Hauter was born in Yemen in 1972, where he grew up and went to school. Mr. Hauter's father immigrated to the United States and spent much of his time there during Mr. Hauter's childhood, so he was principally raised in Yemen by his mother, with whom he was very close. Mr. Hauter had a good, safe childhood and felt loved and supported. However, his mother died when he was in his teens. After completing a program to become a teacher in Yemen, Mr. Hauter decided instead to follow his father and certain of his brothers and immigrate to the U.S.

### B.    Mr. Hauter Builds a Life in the United States

Mr. Hauter came to the U.S. in the mid-1990s, ultimately becoming a naturalized citizen in 2002. Shortly after coming to the U.S., Mr. Hauter married his first wife, Fayroz, which unfortunately resulted in a rupture in his relationship with his father, step-mother, and brothers. Fayroz came from a family with which Mr. Hauter's family had been in conflict for generations. His father did not approve, and the two have essentially had no relationship ever since.

Having lost his mother and his relationships with his father and siblings, Mr. Hauter started his own family and became widely engaged in the Yemeni immigrant community in New York. Mr. Hauter and his first wife have seven children, including three sets of twins, who currently range in age from 10 to 27 years old. He started out supporting his family by working for and operating a series of convenience stores, markets, and delis, several of which Mr. Hauter himself

owned in whole or in part.  Mr. Hauter enjoyed the organizational, planning, and marketing tasks associated with running a small store and he proved to be good at it.  In particular though, he enjoyed the fact that being a store owner placed him in a central role in the community.  The stores were all located in areas settled by immigrants from Yemen and patronized by (and marketed to) that community.  He enjoyed getting to know regular customers and hearing about their lives here, and where they had come from in Yemen.  He was eager to help people, and made a point of helping people who were new to New York or the U.S. find their way and gain an understanding of their surroundings.

Mr. Hauter quickly became seen as a de facto leader within the Yemeni immigrant community.  In addition to operating his stores, Mr. Hauter was active in mosque activities and a variety of community organizations.  Mr. Hauter learned English quickly, making him an important resource for people who did not know the language as well and had difficulty navigating a city that still seemed foreign to them in many ways.  He was a regular presence at local mosques and community events.  He came early and stayed late to help set up and clean up for Friday prayers, the breaking of fasts during Ramadan, and other events.  He volunteered for nearly everything.  People often came to Mr. Hauter for advice or help, and he tried to do as much as he could to help anyone who asked for it.  He became someone whom new arrivals to the U.S. sought out in particular, helping them navigate the government, government services, and find the organizations and professionals they needed to assist them.

In 2005, Mr. Hauter shifted to work as a taxi and limo or black-car driver.  He worked as an affiliate (i.e., a 1099 contractor) for a number of services, including Yellow Cab, BLS Limo, and East Coast Limousine.  He also worked through Uber and Lyft when those services came on-line.  Mr. Hauter was able to make more money as a driver than he had as a store operator.  Mr.

Hauter later moved from Brooklyn to the Bronx. He remained involved in the mosque and community, and his work as a driver took him to different parts of the city, expanding his range of contacts. For example, while remaining involved at the mosque near his home, MAS Bronx Muslim Center, he began also attending prayer at the Al-Rahman Mosque in Washington Heights because it was convenient to his driving routes. While he enjoyed working as a driver, Mr. Hauter missed the daily interactions with members of the community in his stores.

Mr. Hauter remains widely respected within the Yemeni community. His Imam, Dr. Hamud Al-Silwi, confirms his good reputation within that community (Tab 10, Dr. Al-Silwi Letter) and the Imam at the Al-Rahman Mosque also confirms his character and volunteer activities there (Tab 11, M. AJahil Letter.) His landlord describes him as "a kind and respectful person" whom "you can talk to without any issues" as "he is very understanding and likes to maintain a positive relationship." (Tab 12, Shaif Abushaar Letter.)

Many friends within the community have written on Mr. Hauter's behalf to confirm his active participation in helping others by volunteering for causes and helping assist those in need of food, employment, services, or anything. (*See* Tab 13, F. Mubarez Letter; Tab 14, M. Almontaser Letter; Tab 15, B. Almontser Letter; Tab 16, N. Almontser Letter; Tab 17, I. Almontsir Letter; Tab 18, A. Hadi Letter; Tab 19, U. Almontsir Letter; Tab 20, S. Hauter Letter; Tab 21, R. Almontesar Letter; Tab 22, M. Alsaidi Letter; Tab 23, M. Sayed Letter; Tab 24, A. Sayed Letter; Tab 25, O. Musleh Letter; Tab 26, M. Almontaser Letter; Tab 27, G. Kaid Letter; Tab 28, A. Ahmed Letter; Tab 29, M. Obad Letter; Tab 30, M. Al Muntaser Letter; Tab 31, W. Abushaar Letter; Tab 32, F. Almansori Letter.) In the words of one friend, Mr. Hauter "has always led a positive path, and has tried to be a good example to others especially those of a younger generation." (Tab 14, M. Almontaser Letter.) Others commented that he "has always been a very

6

respected man and someone who everyone appreciates" (Tab 23, M. Sayed Letter), "[h]e has such a positive attitude that it actually makes people stay positive and want to be around him" (Tab 16, N. Almontser Letter), he "does not look for trouble and if he sees trouble he tries to fix it" (Tab 25, O. Musleh Letter), and "[h]e is … someone that cares and shows it" (Tab 26, M. Almontaser Letter).

Over the years, Mr. Hauter also has been active in a variety of organizations working within the Yemeni community in New York, including the Yemeni American Association, the New York Yemeni Community, and the Association Ma'onah for Human Rights and Immigration.  Leaders in the Yemeni community recognize Mr. Hauter as "someone that [they] can count on through thick and thin" (Tab 33, 4/24/24 F. Saleh Letter), "an integral part of our community" (Tab 35, A. Alsaede Letter), and "an example of integrity and dedication" with a "strong sense of responsibility and commitment to his family and community" (Tab 36, M. Alaw Letter.)  These leaders confirm his support for individuals and families in need, including "in the aftermath of 9/11, Hurricane Sandy, and the COVID-19 pandemic."  (Tab 35, A. Alsaede Letter.)  While Mr. Hauter is "widely known for his dedication and commitment to volunteer work within his local community," he is known as "not only a kind person but also a man of peace, working towards fostering understanding and collaboration among community members."  (Tab 34, 1/18/25 F. Saleh Letter.)  In particular, Mr. Alsaede explains Mr. Hauter's role as a member of the community's mediation committee where he has worked for years to resolve disputes and settle conflicts.  According to Mr. Alsaede, Mr. Hauter's "ability to bring people together and foster understanding speaks to his integrity, wisdom, and dedication to the well-being of others."  (Tab 35, A. Alsaede Letter.)  In sum, Mr. Alsaede states of Mr. Hauter, for over two decades "I have seen him consistently embody the values of kindness, generosity, and community spirit."  (Tab 35, A. Alsaede Letter.)

Mr. Hauter also has a history of supporting causes back in Yemen. Some of these organizations have also written letters to the Court further confirming Mr. Hauter's "genuine empathy and understanding of the challenges faced by the vulnerable" (Tab 37, Nama Watta Organization for Development Letter) and documenting his support for programs to guard against the spread of extremist ideas in young people (Tab 38, General Union of Yemeni Youth Letter), efforts to feed the hungry (Tab 39, Yemen Food Bank Letter),[1] supporting teachers (Tab 40, National Union for Public Education Letter). In addition, Mr. Hauter has given money on numerous occasions in response to solicitations for help for families, hospitals, schools, mosques, cholera eradication efforts, or other individuals or groups in need back in Yemen. Following the outbreak of civil war in Yemen, Mr. Hauter became especially involved in helping Yemeni refugees fleeing the Houthis, a Zaydi Shia Islamist organization, that had taken over Yemen's capital city, Sana'a in 2014. Mr. Hauter quickly became involved in helping new arrivals to New York get the support and services they needed. He became friendly with an immigration attorney, Julie Goldberg, and he helped facilitate contacts and communication for those in need of legal assistance.

The most important thing to Mr. Hauter has always been his family. Following a divorce, Mr. Hauter remarried in 2013. He and his second wife, Yusra, have three children of their own ranging in ages from 8 to 15. In total, Mr. Hauter has 10 children and 14 grandchildren, the youngest two of which were born just this year. Despite their divorce, Mr. Hauter continued to support his ex-wife and their minor children. Their youngest child is severely autistic, which has required different types of therapy and that he attend a special school. While he is a blessing and Mr. Hauter and the entire family treasure him dearly, his condition obviously brings financial,

---

[1] Mr. Hauter's brother-in-law is the founder of the Yemen Food Bank.

emotional, and logistical complications. Mr. Hauter played the central role in scheduling, tracking, and getting his son to his various appointments and making sure he was getting the educational services that he needed. In addition, Mr. Hauter developed a special emotional bond with this son, a playful joy that he found deeply rewarding. Mr. Hauter's older son, Mohammed, attests to his little brother's affection for their father: "he loves my father very much and he used to express his love for him in a special way." (Tab 4, Mohammed Hauter Letter.) As Mr. Hauter's daughter, Afaf, notes, her younger brother "only shares his laughter with my father and mother" (Tab 2, Afaf Hauter Letter.) The past 13 months have been "profoundly challenging" for the care of this one son. (Tab 9, Fayroz Allahabi Letter.)

Mr. Hauter has 10 children in all, six of whom are now adults living in New York or other parts of the country with their own families. Mr. Hauter is beloved by his children. His oldest daughter, Elham, describes him not only as a "responsible" and "caring" father, but "a person who cooperates with everyone" and "who loves doing good" without expecting anything in return. (Tab 1, Elham Hauter Letter.) His oldest son, Mahmood, describes his father as "the type of father that you can trust and rely on when needed" and recounts his commitment "to our community and religion" and always being one to help those in need, "[e]ven if it is something such as just listening to others and being there for them." (Tab 5, Mahmood Hauter Letter.) His second oldest son, Mohammed, describes Mr. Hauter as "my role model in this life," "a man who has a kind heart who loves good for everyone" and "does not exclude anyone from doing good." (Tab 4, Mohammed Hauter Letter.)

His other children echo these descriptions, with his daughters in particular also noting Mr. Hauter's caring attention to their emotional and psychological needs. (Tab 2, Afaf Hauter Letter; Tab 3, Asem Hauter Letter.) What Mr. Hauter has taught his children are "the values of empathy,

responsibility, and selflessness." (Tab 3, Asem Hauter Letter.) What his children have seen, over and over from Mr. Hauter, is the surpassing importance of being "kind, giving, and selfless" and defining oneself "by the kindness and love" shown to others in your life, whether family, friend, or stranger. (Tab 6, A.H. Letter; Tab 7, Jasem Hauter Letter.) He is a man possessed of "an incredible capacity for love and a true desire to help others" Tab 3, Asem Hauter Letter.) His current wife and his former wife both confirm Mr. Hauter's character, not only his responsibility and hard-working nature, but his care and support for those around him. (Tab 8, Yusra Alsedeai Letter; Tab 9, Fayroz Allahabi Letter.)

C.    **Mr. Hauter's Current Situation**

Incarcerated since February 2024, Mr. Hauter has been unable to work to support his family and he has not been present to provide emotional support and household stability for his family. With no income to meet their regular expenses, Mr. Hauter's ex-wife and her minor children have moved in with Mr. Hauter's current wife and her children. They all currently share a single apartment. Mr. Hauter's adult sons have done their best to help with bills and make the minimum payments on Mr. Hauter's debts where possible, but resources remain limited. Mr. Hauter's wife has begun working in a local market to help make ends meet. His ex-wife has applied for food stamps and other government assistance. To assist with maintaining the household, caring for Mr. Hauter's autistic son, and managing the other children and their schedules, Mr. Hauter's 15-year-old daughter (who speaks excellent English) has switched to an online school so that she can stay at home. This is not ideal, and her education has suffered, but it has unfortunately fallen to her to pick up many of the duties and tasks Mr. Hauter had previously performed for the family.

In terms of his own health, MDC specifically and jail generally have led to a notable deterioration in Mr. Hauter's physical health. He was the victim of an assault at MDC from which

he suffers continuing shoulder, face, and jaw pain.  He is now more than a year overdue to have dental work following up on implants inserted in 2022 in connection with which he still has screws in his jaw (one of which is broken) that need to be removed.  Mr. Hauter also understands he has at least three other teeth that need to be removed.  He is also overdue for gall gladder surgery to remove gallstones which regularly cause him abdominal pain.  All of these issues have languished while Mr. Hauter has been incarcerated and are in increasingly urgent need of attention.

## III.    Nature and Circumstances of the Offense

Mr. Hauter is convicted of conspiring with others to transmit money without a license. Sometimes referred to as "hawala," the particular activity in which Mr. Hauter became involved centered in the American Yemeni community.  Mr. Hauter had long been aware that many people in the New York Yemeni community sent money back to Yemen through brokers rather than using the more formal banking or money transfer channels, especially after the Houthi militias had seized control there.  He had himself made contributions to charitable relief campaigns where he understood the money was being collected by a broker to transmit it back to Yemen.

American audiences are well aware of the aggressive and reckless actions of Houthi militias towards Red Sea shipping traffic and U.S. military forces, and the continuing U.S. military strikes in response.  The humanitarian crisis in Yemen and the Houthi forces' oppression of the local population have received less widespread attention in the U.S.  The Houthis, officially known as Ansar Allah, are a Zaydi Shia Islamist organization that emerged in Yemen during the 1990s; numerous countries have designated them a terrorist organization and condemned their human rights abuses, including targeting civilians and using child soldiers.[2]  In September 2014, the

---

[2]  "Who Are Yemen's Houthis?" Wilson Center, July 7, 2022, *available at*. https://www.wilsoncenter.org/article/who-are-yemens-houthis.

Houthi insurgency took over Yemen's capital city, Sana'a, and the ensuing civil war has produced one of the world's most severe economic and humanitarian crises.

In September 2016, the internationally recognized government relocated Yemen's Central Bank from Sana'a to Aden.  The move to Aden aimed to cut off Houthi access to state funds.  However, in retaliation, Houthis seized control of the bank's remaining institutions in Sana'a to maintain financial leverage.  The group froze accounts, seized assets, and established a parallel financial system to finance their war efforts.  They also imposed new taxes and levies, worsening inflation, and economic instability.  This takeover exacerbated Yemen's financial crisis, causing currency devaluation, unpaid salaries, and increased hardship for civilians.[3]

Houthi control over key financial institutions resulted in a severe economic downturn. Since 2015, Yemen's real GDP has fallen by 54 percent.[4]  This economic downturn has been accompanied by rising inflation, irregular or delayed payment of civil servant salaries, and the collapse of basic services, leaving people unable to meet their basic needs.  According to the Norwegian Refugee Council, staple food prices have surged by up to 45% above usual rates, almost 83% of the population live in multidimensional poverty, and 70% of the population are affected by lack of schooling and access to adequate sanitation.  As of January 2025,

---

[3] Khaled, Fatma, and Ahmed Al-Haj. "Fight for Control of Yemen's Banks between Rebels, Government Threatens to Further Wreck Economy." AP News, June 17, 2024 (*available at* https://apnews.com/article/yemen-houthis-banks-currency-economy-7ac9bcfc6f883f52573df6147db51b13).

[4] "Yemen Faces Mounting Economic Challenges as Conflict Continues, Regional Tensions Escalate," World Bank, October 31, 2024 (*available at* https://www.worldbank.org/en/news/press-release/2024/10/31/yemen-faces-mounting-economic-challenges-as-conflict-continues-regional-tensions-escalate#:~:text=The%20Fall%202024%20edition%2C%20%22Confronting,GDP%20per%20capita%20since%202015.).

approximately 17.1 million people, or 49% of Yemen's population, need food and agriculture assistance.[5]

The Yemeni population is propped up by money from abroad, including from remittances from the Yemeni diaspora, particularly from the United States, Saudi Arabia, and other Gulf countries, as well as humanitarian aid from international organizations. Yemeni-American remittance funding to their home country is crucial for survival, as it helps families afford necessities like food, medicine, and housing. The dire situation in Yemen has made financial transfers a crucial lifeline for families enduring the overwhelming impacts of the conflict and economic collapse.

The World Bank estimates that personal remittances to Yemen have exceeded $3 billion each year since 2012, approaching $3.8 billion annually since 2016.[6] Others estimate the true value of personal remittances to Yemen at as high as $8 billion per year. ACAPS, "Yemen: The impact of remittances on Yemen's economy," at 16 (October 15, 2021), *available at* https://www.acaps.org/fileadmin/Data_Product/Main_media/20211015_acaps_yemen_analysis _hub_impact_of_remittances_on_yemens_economy.pdf. ACAPS, a non-profit, non-governmental project that provides independent humanitarian analysis, explains that Yemen has historically been a cash-based economy, and a modern banking system was not introduced there until 1990. *Id.* at 17. As a result, informal remittance systems have long been used in Yemen and were established well before the crisis occasioned by the current civil war. *Id.* Owing to

___

[5] "Nine Years On: Economic Downturn Plunges Millions into Poverty in Yemen." NRC, March 26, 2024 (*available* at https://www.nrc.no/news/2024/march/nine-years-on-economic-downturn-plunges-millions-into-poverty-in-yemen/).

[6] Word Bank, Personal remittances, received (current US$) – Yemen, Rep. (*available at* https://data.worldbank.org/indicator/BX.TRF.PWKR.CD.DT?end=2019&locations=YE&start=1 990&view=chart).

derisking measures against Yemeni banks, no direct SWIFT transfers or electronic remittances can be sent to Yemen from the UK or the US; the only formal means available from those countries are global money transfer companies like Western Union and MoneyGram. *Id.* at 18. These services, however, are more difficult to access, less reliable, take longer, and are more expensive than the traditional informal money transfer networks. *Id.* at 18-19. For rural areas, the traditional informal networks are *the only* means by which to send money. On top of all of the access and cost issues favoring informal networks, the Houthis have made a practice of monitoring and interfering with incoming remittances through the global money transfer companies both to enrich themselves and to prevent interference with their own currency controls, meaning that sending money through Western Union or MoneyGram is likely to be noticed and inquired about with the funds ultimately being held up and seized in whole or in part by the Houthis. Since 2017, UNICEF has itself used existing hawala networks to provide cash transfers to 1.45 million households in Yemen. *Id.* at 17.

This is the background against which Mr. Hauter became involved in the informal money transmitting business, and the circumstances motivating the transactions that went through that business. In 2020, the Covid pandemic arrived and changed nearly everything about life. For Mr. Hauter, this was devastating because, at that point, he was relying on work as a driver through ridesharing applications and car services for his livelihood. The demand for such services disappeared almost completely overnight. A man Mr. Hauter knew in the Yemeni community, Abu Adam, saw that he needed work and approached Mr. Hauter about helping him. Mr. Hauter agreed to do so, and Mr. Adam gave Mr. Hauter instructions to collect a large amount of money (Mr. Hauter believes it was in the neighborhood of $100,000) from another individual in the community whom Mr. Hauter also knew, and then take that money to another person (whom Mr.

Hauter learned was Mr. Al-Zubaidi). Mr. Hauter did so, and his involvement expanded from there, eventually including Mr. Hauter himself accepting smaller amounts (often as little as $100) from local Yemeni immigrants who wanted to send the money to friends, family, or charitable organizations back in Yemen. The more Mr. Hauter became involved, individuals from the community began approaching him directly in the first instance and Mr. Hauter would himself set up the transaction with a broker or multiple brokers instead of simply taking directions from others. Mr. Hauter was careful to accept such requests only from people he knew personally from the Yemeni community, for many of whom he already knew the situation their relatives were experiencing in Yemen. For transactions involving brokers, Mr. Hauter generally asked the broker who the people were sending the money, where they lived, and how the broker knew them.

Mr. Hauter would eventually work with and through multiple brokers, not just Dr. Al-Zubaidi. For each of them, Mr. Hauter either (1) knew them personally or indirectly through others such that he had confidence he could trust them, or (2) had not known them previously, like Dr. Al-Zubaidi, but learned enough about them to have confidence in their integrity. Mr. Hauter was selective about who he worked with because he did not want to be associated with anyone that cheated any of their customers or who would even consider transferring money for drug dealers, gangs, or terrorists. Almost all of the transactions of which Mr. Hauter was aware were situations where money was being sent ultimately to Yemen (albeit through brokers in Dubai or elsewhere), though Mr. Hauter does recall a few going the other direction, from Yemen to the U.S. One that Mr. Hauter recalls specifically is a situation where a man in Yemen had sold his house there, but was unable to get the sale proceeds out of Yemen.

No matter how well-intentioned the transfers were, Mr. Hauter acknowledges that it was not legal to accomplish them in this fashion. And for good reason. The process takes place outside

of the oversight of not only the corrupt and opportunistic Houthi forces in Yemen, but also responsible government regulators in the U.S. and elsewhere. The trust within the Yemeni community that allows for this system to work could be exploited by criminals to launder the proceeds of their activity. That said, there is no evidence that the transactions in which Mr. Hauter was involved exploited the system in these ways. Mr. Hauter certainly did not become wealthy as a result of any of this. In fact, he was working multiple jobs to support his family. In 2022 he returned to his original calling and began working in and operating markets with business partners, including helping one of his son's establish a market which he still runs today.

## IV.    Sentencing Guidelines

Mr. Hauter and the government agree that his Total Offense Level is 25 and his Criminal History Category is I, resulting in an effective guideline range of 57 to 60 months. That range is driven by the totality of the amount of funds transferred across the entire conspiracy, a 22-level offense level increase produced by cross-reference to the amount-of-loss table from the fraud Guideline provision. In this case, there is no loss or victim as in the case of a fraud offense as there is no evidence that any transferor was denied the benefit of the funds they desired to send. It does not diminish the seriousness of the instant offense to state the obvious that it is certainly a *less serious* offense to transfer $65 million unlawfully than it is *to steal* $65 million from someone. As such, the structure of the Guidelines in this instance necessarily overstates the severity of the offense.

## V.    Need to Reflect Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment

A sentence of time served, *i.e.*, just under 15 months would sufficiently reflect the seriousness of Mr. Hauter's offense, promote respect for the law, and provide just punishment for the offense. Although his punishment must be serious enough to promote respect for the law, it

does not need to be unduly punitive to accomplish this goal. It must be sufficient, but not more than necessary. 18 U.S.C. § 3553(a). More than a year in jail clearly communicates the seriousness of the offense and commands respect for the law giving Mr. Hauter's standing in the community and the absence of evidence or allegations about any other criminal aspect to the money transmitting. As detailed previously, this informal system of money transfers is longstanding and well-known in Yemen and the Yemeni community. Federal felony charges and a jail sentence of this nature is a clear signal that no matter how traditional this activity may be, it is against the law.

## VI.    The Need for Deterrence

With respect to specific deterrence, as a general statistical matter, it is unlikely that a 52-year-old, first-time offender like Mr. Hauter will commit any other crime in his lifetime. That people "age out" of crime is "one of the most well-established facts in criminology." *See* Council on Criminal Justice, "Recidivism Rates: What You Need to Know," *available at* www.counciloncj.org/recidivism_report/.[7] The Sentencing Commission has found that the recidivism rate of older offenders is less than half that of offenders under the age of 50. at 5, 41-44, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Older-Offenders.pdf. Most specific to Mr. Hauter's profile, the Sentencing Commission has reported that Criminal History Category I offenders over 50 have only a 6.2% re-arrest rate (including arrests for supervised release violations). *See* U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines at 28, Exh.

---

[7] According to a United States Sentencing Commission Report, "[s]tudies have repeatedly shown that older offenders at sentencing are at lower risk for reoffending, and the Commission's research confirms these findings." *See* Saris, *et al.*, Recidivism Among Federal Offenders: A Comprehensive Overview (March 2016) at 23, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf (last visited Sept. 22, 2023).

9, *available at* http://www.ussc.gov/publicat/Recidivism-General.pdf.  Additional months or years of imprisonment will not make it any less likely that Mr. Hauter will re-offend.  *See United States v. Saenz-Nunez*, 2011 WL 6013477 at *4 (D.N.M. Nov. 28, 2011) (noting that the defendant's lower likelihood of recidivism at the age of 53, combined with criminal history, justified a 4-level departure from the guidelines).

Even aside from the numbers, the punishment that Mr. Hauter has endured in this case has afforded more than adequate deterrence to future criminal conduct.  These events have changed the entire course of his life, placing his family under considerable pressure and without his financial, emotional, and household support.  Mr. Hauter has lost much more during this criminal process than he ever would have gained from the crimes committed.  As his personal history demonstrates, Mr. Hauter is not one who is enticed by a life of crime or reckless behavior.  The crime he committed stemmed from a lack of work during the COVID pandemic and a misguided desire to help the people within his community and in his native Yemen, not an active disrespect for the law.  Mr. Hauter has acknowledged his mistakes and has demonstrated he is moving forward as a law-abiding member of society.

With respect to general deterrence, a sentence of over a year in prison, a forfeiture judgment, and a federal felony conviction all send a clear signal to anyone else who may find themselves in Mr. Hauter's shoes that an unlicensed money transmitting business is not an appropriate undertaking, no matter the nature of the customers served or the operator's good intentions.  The fact that Mr. Hauter will have served more than a year in jail despite that none of his customers were defrauded and there was no evidence, or even allegation, that any of the money transmitted came from or went to support any unlawful activity sends a very strong message about

the seriousness of this crime.  Adding additional prison time as a deterrent would be marginal, as it is the certainty of the punishment, not its severity, which deters crimes.

## VII.    The Need to Avoid Unwarranted Sentencing Disparities

As noted in the PSR, for the period from 2019 through 2023, defendants whose primary guideline reference was § 2S1.3 and had the same offense level and criminal history category as Mr. Hauter, received an average sentence of 24 months.  This is a relevant date point, but still somewhat general as unlawful money transmission is not the only offense referenced to § 2S1.3.  Also referenced to that provision are violations under §§ 1956 and 1957, *i.e.*, money laundering where an element of the offense is the nature of the funds involved being criminal proceeds.  There is no evidence of that in this case, and the offense of conviction is not money laundering.

Looking specifically at money transmission cases, it should be noted that most such cases also involve some other related criminal conduct, such as smuggling, drug dealing, or an underlying fraud scheme.  Even in those cases though, courts have generally imposed sentences significantly below the applicable Guideline Range.  For example, in *United States v. D'Urso*, Case No. 1:21-cr-652-JSR, (S.D.N.Y. 2023), the defendant was convicted of both money transmitting and a securities fraud scheme where $8.4 million was stolen from the victims of the fraud.  The Guidelines Range in that case was 168 to 210 months; the Court imposed a sentence of 42 months.  And in *United States v. Hernandez*, Case No. 1:24-cr-447-RA (S.D.N.Y. 2024), the defendant (a flight attendant) had smuggled cash proceeds from drug sales into the Dominican Republic.  The Guideline Range was 24 to 30 months; the Court imposed a sentence of three months with nine months home detention.  Accordingly, even where there is an underlying or associated fraud or drug offense involved, the Court has imposed below-Guideline sentences in

the range of 12.5% (*Hernandez*) to 25% (*D'Urso*) of the low end of the applicable Guideline Range.  In this case, that equates to a range of 7 to 14 months.

While money transmitting cases unaccompanied by an underlying or associated crime are rare, there have been some.  In *United States v. Mazza-Alaluf*, Case No. 1:07-cr-403-PKC (S.D.N.Y. 2009), the defendant was charged with transmitting approximately $244 million without a license.  *See* 621 F.3d 205 (2d Cir. 2010).  Like in this case, there was no accompanying charge of any other criminal offense and there was no evidence the funds transferred were the proceeds of any illegal activity or transferred to further any illegal purpose.  Unlike this case, the defendant went to trial rather than plead guilty.  Following his conviction, the effective Guideline Range was 120 months.  This Court imposed a sentence of 42 months with two years of supervised release— 35% of the low end of the Guideline Range.  In this case, that would equate to a sentence of just under 20 months.

Accordingly, even before looking at the particular details of this case, a high-level, general comparison of this case to the sentences imposed in others suggests a sentence substantially below the Guidelines Range.  All of the cases detailed above involved facts or circumstances making those cases *more serious* than the instant case.  *D'Urso* and *Hernandez* involved the transmission or transport of funds known to be the proceeds of criminal activity and *Mazza-Alaluf* involved nearly *four times* the amount of funds involved here.  Even setting that aside though, the above cases demonstrate that, in order to avoid unwarranted sentencing disparities, the sentence in this case should be somewhere between 7 and 25 months at the most.

Finally, when evaluating the adequacy of the term of imprisonment imposed, it is important to keep in mind that whatever sentence the Court imposes will necessarily be more severe than it would appear at first glance.  The reason for this is that Mr. Hauter already has served nearly 15

months of imprisonment, meaning that he cannot, by definition, receive good-time credit or any other benefit associated with his behavior and activities while confined. Therefore, a sentence of time served today is actually *more severe* than a sentence of 16 to 18 months imposed upon a defendant who has spent no or much less time in pretrial confinement.

## VIII.   MDC Experience

Mr. Hauter has already served seven and a half months—from his February 1, 2024 arrest until September 10, 2024—imprisoned under the appalling conditions that continue to exist at the Metropolitan Detention Center ("MDC"). While at MDC, Mr. Hauter was assaulted in his cell by a group of gang members who punched him repeatedly in the face and he was the target of multiple extortion attempts accompanied by threats to himself and his family.

On the fifth floor where Mr. Hauter was initially housed at MDC, a group of gang members somehow obtained a copy of the indictment in this case and/or the press release about his arrest. Believing Mr. Hauter to have access to more than $65 million, the gang members demanded that he arrange for sums of money to be sent to people or accounts they specified. If Mr. Hauter did not do what they demanded, they threatened to stab him and further threatened to harm his family, stating that they "can get to your family." To prove it, they showed Mr. Hauter a picture of his own residence displayed on a contraband smartphone one of them had. On May 30, 2024, two of the gang members assaulted Mr. Hauter in his cell, while another two stood guard outside his cell. The two gang members repeatedly punched Mr. Hauter in the face.

After the assault, Mr. Hauter was moved to MDC's Special Housing Unit ("SHU") for his safety, where he spent 45 days. The SHU conditions were even more restrictive and Mr. Hauter spent essentially all of his day on lockdown and he lost the ability to communicate with his family, being allowed just one 15-minute call per month. In July 2024, Mr. Hauter was moved out of the

SHU and to the eighth floor. The eighth floor was supposed to be a safer environment because the inmates there purportedly were people trying to extricate themselves from gang life or who were potentially in danger if housed elsewhere. Nevertheless, the threats to Mr. Hauter resumed. Mr. Hauter's cellmate on the eighth floor was also from Yemen and knew of Mr. Hauter and his family, including the names of some of his children and the market operated by one of his sons. Mr. Hauter's cellmate said to Mr. Hauter that his family had read about Mr. Hauter in the news and saw that he had a lot of money. The cellmate threatened to "cut his face up," or words to that effect, if he did not pay his family money. The cellmate then told others that Mr. Hauter had money, and all of a sudden numerous other inmates began approaching him, some similarly demanding money accompanied by explicit or implicit threats and others offering to protect him from those who were targeting him in exchange for money. Mr. Hauter's cellmate took his watch and refused to return it. He said that if Mr. Hauter sent money to people he would identify, he would return the watch. If not, Mr. Hauter's cellmate said that he would stab him. At this point, Mr. Hauter was moved back into the SHU. Eventually, on September 10, 2024, Mr. Hauter was moved out of MDC and to Hudson County.

As the Court is aware, the ongoing conditions at MDC, the only federal prison facility serving this region, are atrocious. Shocking instances of brutal violence up to and including homicides and stabbings, unbridled assaults, rampant and uncontrolled violence, constant threats of violence, drug debt collection, drug fights, organized gang robbery, inordinate periods of lockdown, inadequate and/or substantially delayed medical care, dreadful conditions (*e.g.*, mold, contaminated drinking water, broken lights, broken emergency call buttons), woeful lack of supervision, widespread smuggled contraband (including cell phones and narcotics), bribed corrections officers, and "chaotic, unremedied lawlessness" are among the long list of problems at

MDC.  *See, e.g.*, *United States v. Colucci*, 743 F. Supp. 3d 452, 456-60 (E.D.N.Y. 2024); *United States v. Chavez*, 710 F. Supp. 3d 227, 232-34 (S.D.N.Y. 2024); *United States v. Griffin*, No. 22-cr-408 (EK), 2024 WL 2891686 at *3 (E.D.N.Y. June 10, 2024).

As a result, it has become "routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC." *Chavez*, 710 F. Supp. 3d at 229; *see also Colucci*, 743 F. Supp. 3d at 460-62 (imposing nine-month sentence of imprisonment but providing that the same be converted to home confinement if BOP designated MDC as the carceral institution); *Griffin*, 2024 WL 2891686 at *3 (granting motion for compassionate release based primarily on the conditions at MDC for a defendant serving time for violating supervised release); *United States v. Santana*, No. 22 CR. 368 (VM), 2024 WL 2275037 at *2 (S.D.N.Y. May 20, 2024) ("Given the severe prison conditions that prevail at the MDC (conditions that amount to imposing harsher punishments on prisoners), this Court and others have adjusted sentences of defendants in custody there for lengthy periods.").  The conditions at MDC make time spent there "essentially the equivalent of either time and a half or two times what would ordinarily be served."  *United States v. Gonzalez*, No. 18-cr-669, ECF No. 250 at 17:18–18:3 (S.D.N.Y. April 2, 2021) (concluding 24 months defendant had served at MDC "is equivalent to having served three years" and imposing sentence of time served).  Stated simply, time at MDC is "materially different and necessarily disparate from [time] served elsewhere[.]"  *Colucci*, 743 F. Supp. 3d at 462.

Mr. Hauter's own experience at MDC is unfortunately yet another example of the unchecked violence and lawlessness that has been allowed to persist there.  Lockdowns occurred frequently; there were three deaths within a three-month period; there was no hot water.  From the outset, he witnessed rampant violence and intimidation, abundant contraband, and the ability of

other inmates to communicate and direct actions of others on the outside.  Despite his best efforts to keep a low profile and reveal little about himself or his family, Mr. Hauter himself became the target of violence and multiple extortion attempts.  The sentence imposed by the Court should account for all of this.

## IX.   Conclusion

When he appears before the Court for sentencing on April 22, 2025, Mr. Hauter will have already served 14 months and 21 days in custody, roughly half (7 months and 9 days) of which was served at MDC where Mr. Hauter experienced first-hand the horrendous conditions there and himself because the target of violent assaults and repeated extortion attempts backed up by threats to the life and safety of himself and his family.  Recognizing, as numerous judges of this Court have, that time served at MDC is not equivalent to the same time served at other facilities, Mr. Hauter already has served the equivalent of between 18 and 22 months.  The time Mr. Hauter already has served, especially under the circumstances, is sufficient, but not more than necessary to serve the purposes of 18 U.S.C. § 3553(a).  Accordingly, we submit that a sentence of time served is appropriate.

As detailed previously, Mr. Hauter has led a productive and generous life, bettering both himself and the world around him.  He has a large family of ten children and 14 grandchildren. He has no prior criminal history and the instant offense, while certainly serious and presenting a risk of being exploited by criminals, was motivated in large part by a genuine desire to help the people in his community and home country.  Mr. Hauter has lived a responsible, law-abiding, and hard-working life in which he has consistently been a positive force in the lives of his family,

friends, and community.  While serious and warranting punishment, the offense of conviction is out of character, and therefore more than merits a below-guidelines sentence of time served.[8]


Dated:    April 8, 2025                              Respectfully Submitted,


                                                     By: /s/Tillman J. Finley
                                                     Tillman J. Finley
                                                     MARINO FINLEY LLP
                                                     818 Connecticut Ave., NW, Suite 801
                                                     Washington, D.C.  20006
                                                     Telephone: (202) 223-8888

---

[8] *See United States v. DiMattina*, 885 F. Supp. 2d 572, 581-82 (E.D.N.Y. 2012) (finding the defendant's characteristics, including the fact that this was his first criminal conviction, he had no substance abuse history, had been continuously employed since graduating high school, was a hardworking businessman, had been married to his wife nearly nineteen years, and raised three children, in addition to receiving support from multiple letters praising his good character, confirmed that the crime of extortion for a contract bid resulted from aberrant behavior and warranted a below-guidelines sentence of 12 months.).