

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

April 16, 2025

**BY ECF**
Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   *United States v. Shaker Saleh Hauter,* 24 Cr. 51 (PKC)

Dear Judge Castel:

The Government respectfully submits this letter in advance of the April 22, 2025 sentencing of defendant Shaker Saleh Hauter. For the reasons explained below, the Government respectfully submits that a sentence of 57 months' imprisonment, which is at the bottom of the applicable Guidelines range, would be sufficient but not greater than necessary to serve the purposes of sentencing.

## I.  Background

### A.  Offense Conduct

#### 1.  *Overview of the Defendant's Scheme*

As set forth in the Presentence Investigation Report ("PSR") and in the Indictment (Dkt. 1), between 2018 and at least 2022, the defendant and his two co-defendants—Mohanad Al-Zubaidi, and Abdulkader Hamza—operated an unlicensed money transfer business that was responsible for illicitly moving more than $65 million between the United States and countries in the Middle East and elsewhere, including Yemen, Turkey, Iraq, the United Arab Emirates, and Jordan, on behalf of others. (PSR ¶ 12). The defendant, Al-Zubaidi, and Hamza facilitated hundreds of illicit money transfers, with each transfer ranging from thousands to hundreds of thousands of dollars. (PSR ¶ 12). For the illicit transactions they completed, the defendant and his co-defendants typically earned a commission of between one and six percent of the total amount transferred. (PSR ¶ 12). The one- to six-percent commission often reflected a total commission that was otherwise split among the defendants or those working with them to complete the illegal money transfers. (PSR ¶ 12). Typically, the defendant received a portion of that total commission ranging between 0.5% and 1.75% of the total money transferred, although sometimes his commission could be greater. (PSR ¶ 12). To facilitate these illicit transfers, the defendant and his co-defendants worked with other members of an international network of money brokers to transfer money through an informal money transmitting system known as "hawala." (PSR ¶ 12).

*Hawala* is a method of moving money outside the formal banking system that allows one party to transfer money to another party without any physical money actually moving. (PSR ¶ 13). The money transfers that *hawala* brokers—like the defendant, Al-Zubaidi, and Hamza—complete for their customers are cheaper, swifter, and more anonymous than the formal banking system. (PSR ¶ 14). Unlike a traditional bank transfer such as a wire transfer, there are no official records of *hawala* transfers, and it is difficult to trace the original source of the money. (PSR ¶ 14). Because of those attributes, *hawala* networks are often used by money launderers and other criminals to transfer criminal proceeds. (PSR ¶ 14). Typically, money brokers engaged in *hawala* communicate only limited information about the source and the beneficiary of the funds they move. (PSR ¶ 14). For example, they often collect funds from their customers in cash or money orders and then move the funds through shell companies to disguise the source and nature of the funds involved in the transaction. (PSR ¶ 14). The defendant, Al-Zubaidi, and Hamza used similar methods in this case.

More specifically, the defendant ran his own unlicensed money transfer business out of the Bronx and served as an intermediary money broker for co-defendant's Al-Zubaidi and Hamza among others. (PSR ¶ 22). Individuals or companies looking to transfer money between the United States and the Middle East, among other places, contacted the defendant directly (or through other money brokers) to get the defendant to transfer money to others on their behalf. (*See* PSR ¶¶14, 22). Those individuals and businesses went to the defendant to avoid using the legal banking system. (*See* PSR ¶ 14).

To carry out those illicit money transfers, the defendant regularly coordinated with his codefendant, Al-Zubaidi, who, in turn, had created four shell companies and opened countless bank accounts in the name of those shell companies in order to surreptitiously transfer money as part of this scheme. (PSR ¶¶ 15, 22). The defendant used Al-Zubaidi to complete financial transactions for the defendant's clients by regularly handing off large amounts of cash to Al-Zubaidi and Hamza (Al-Zubaidi's father), which the defendant (and at least one of his sons) had collected from his clients. (*See* PSR ¶¶ 15, 17, 21-23). Al-Zubaidi then sent wire transfers to the defendant's desired recipients. (PSR ¶¶ 15, 18, 22). The defendant used people like Al-Zubaidi to complete the unlicensed money transfers for him, rather than do it himself, because the defendant, who didn't create any shell companies of his own, wanted his identity to remain a secret to law enforcement.

Overall, based on a review of a digital ledger used by the defendant to manage his illegal money transfer business, which tracked transactions between in or about the beginning of 2020 through the middle of 2022 (which is not the whole period he was involved in this scheme), the defendant executed approximately $43 million worth of illegal transactions. (PSR ¶ 26). Using a conservative estimate of the defendant's commissions earned on those transactions—that is, assuming a one-percent commission on just the transactions from the digital ledger—the defendant would have earned approximately $430,000 through his illegal money transfer business. Based on statements the defendant made to the Government during this case, the Government understands that the defendant used some of the profits he earned from this illegal scheme to buy a Cadillac SUV, to renovate his home, and to open other businesses, among other things.

2. *The Means and Methods of the Defendant's Scheme*

During this investigation, the Government obtained warrants to search Al-Zubaidi's iCloud (the "iCloud"), Al-Zubaidi's Google account (the "Google Account"), and the defendant's cellphone (the "Cellphone"). Those sources contained extensive evidence of the defendant's guilt, including many examples of communications establishing the means and methods of the defendant's unlicensed money transmitting business and the network of money brokers with whom he worked. The communications included text messages, WhatsApp messages, and voice notes exchanged between (i) the defendant and Al-Zubaidi, (ii) the defendant and Hamza, and (iii) the defendant and his clients or other money brokers, among others.[1]

For example, on or about March 13, 2022, the defendant exchanged messages with Al-Zubaidi over WhatsApp regarding a money transaction that went awry. (PSR ¶ 24). More specifically, the defendant told Al-Zubaidi that someone was stuck in Chicago with $600,000 and that police took that person to a bank, counted the money, gave him a piece of paper, and did not imprison him. Al-Zubaidi asked for the paper that the police gave that person in Chicago and the defendant sent Al-Zubaidi a receipt for the seizure. the defendant then wrote Al-Zubaidi, "the owner of the company called me to help him, and he is ready to pay any percentage." The Government understands "percentage" to mean a commission. The defendant and Al-Zubaidi exchanged more messages about this transaction and Al-Zubaidi asked the defendant how much the defendant had available, which the Government understands to be a reference to how much money the defendant could contribute to that transaction. Ultimately, the defendant directed Al-Zubaidi to contact another money broker located outside of the United States to finalize the transaction. (PSR ¶ 24).

Similarly, between in or about September 2020 and November 2021, the defendant engaged in a WhatsApp conversation with two other international money brokers. During that conversation, the three men discussed money transfers. For example, on or about September 13, 2020, Hauter agreed to provide one of the other brokers with Dirham in Dubai for a commission. The two then continued to negotiate about money transfers. During that discussion, the defendant wrote the following about his money transmitting business, among other things: (i) "If you want I can do 1[ ]M[illion] a week that depends on your capacity in Dubai how much can payout" and (ii) "Doing business is the goal but with way that beneficial all parties I can't do transfer without commissions I already Offer half the cost in same time you profit from the low exchange rate you giving me." The defendant also sent voice notes to the other brokers during which he explained how his money transfer business worked. For example, in one voice note, Hauter explained that he was charging the other brokers the same rate to do a wire transfer that it costs Hauter to do the transfer. He further explained that he had "to pay the person who conducts the wire. I'm doing it through companies. So the company that they do the wire for me. I give them the cash, they do the wire. They charge me that much."

---

[1] Often, the content of the iCloud and the Cellphone was in Arabic. During the Government's review of the iCloud and the Cellphone, the Government used machine translations, including Google translate, to translate the content of the iCloud and the Cellphone from Arabic to English.

Other records found in the iCloud, Google Account, and Cellphone—including images, videos, and search history—provide further insight into the means and methods of the defendant's illegal money transfer business. (*See* PSR ¶ 25). For example:

- There were hundreds of images of individual bills of US currency saved in the Cellphone. Those images are consistent with the defendant sending or receiving bills as "tokens" for money transfers, where the serial number on the bills would be used to confirm the transactions. (PSR ¶ 25(a)). Below are some examples:

  

*Images of US currency used as tokens from Shaker's conversation with son Asem Hauter*

- There were many images of bulk cash and bank receipts saved in the Cellphone, including images of the defendant with bulk cash and a money counter as well as images of bank receipts for deposits that correspond with entries on the digital ledger discussed above. (PSR ¶ 25(b)). Some examples are below:

 

*Shaker with bulk cash, black bag, and money counter*    *Image of money counter*


*Image of bulk cash*


*Image of bulk cash in black bag*


*Images of bank receipts that correspond to transactions with Al-Zubaidi*

- There was also search history saved in the Google Account demonstrating Al-Zubaidi's involvement with the defendant in this illicit financial scheme. (PSR ¶ 25(c)). For example, in or about February and March 2022, Al-Zubaidi conducted Google searches for things like (i) "Shaker Hauter," (ii) "fbi is investigating a money laundery [sic] network in nyc," (iii) "united states vs mohanad alzubaidi," and (iv) "fbi is investigating arab money laundering network." (PSR ¶ 25(c)).

During this investigation, the Government also conducted video and physical surveillance at a location in the Bronx that was known to be an area where the defendant and his two co-defendants conducted money transfers during which law enforcement officers observed Hamza meet with and pick up what were black bags full of cash from the defendant and at least one of his sons on occasions in May, June, and July 2022.

3. *The Defendant's Clients*

While the defendant hails from Yemen and engaged in illegal money transfers on behalf of Yemeni clients, the defendant transferred money for many other people as well, including individuals with connections to Jordan, Dubai, Turkey, Iraq, Iran, China, Malaysia, and Russia. Moreover, while the defendant knew some of the clients who hired him to illegally transfer money, he did not know most of the clients he transferred money for or take any steps to vet those clients. Specifically, based on statements the defendant made to the Government during this investigation, the defendant rarely asked clients what they did or where the money came from; his role, as he put it, was to collect the money and pass it to someone else.

For example, the defendant told the Government that he dealt with a lot of "Russian people." He would drop off a lot of money to a lot of Russians here in the United States on behalf of brokers in Dubai and Turkey. According to the defendant, "Russians are very particular. They come with dollar code; no name; no address; just dollar serial number." The Cellphone also contained evidence of the defendant's illegal money transfers with Russian counterparts. In March 2022, for example, the defendant discussed moving $183,835 in cash to Russians in the United States. During that transaction, the defendant's Russian counterparty (i) complained to the defendant that the defendant shorted her $2,100, (ii) told the defendant that the Russian had contacted the "Istanbul office" and was told that the defendant had to replace the missing money, and (iii) provided bills in denominations that were unacceptable to the Russian counterparty (e.g., five-dollar bills, ten-dollar bills, and 20-dollar bills).

As another example, the defendant also told the Government that he illegally transferred approximately $120,000 to a Malaysian diplomat at the Mandarin Oriental hotel in Manhattan that was sent to the defendant from Turkey. According to the defendant, he met the Malaysian diplomat in a diplomatic vehicle outside of the hotel and delivered the cash all in hundred-dollar bills, which was a specific request from the client.

As yet another example, the Cellphone contained a recording of the defendant discussing transferring $300,000 to China with another broker located outside of the United States.

4. *Examples of Lies the Defendant Told to Avoid Detection*

During the scheme, the defendant also engaged in substantial efforts to hide his illegal scheme from law enforcement, including bribing an employee of a check cashing establishment to structure money orders on his behalf and lying to law enforcement during an interview about his suspected criminal conduct.

Part of the defendant's scheme involved the defendant converting cash he received from customers into money orders in order to further obscure the illegal nature of his business. To accomplish that goal, the defendant paid bribes to one individual ("Individual-1") who worked at a Bronx-based Pay-o-Matic, a check cashing business, to structure money orders on the defendant's behalf to help the defendant avoid detection from law enforcement. During the relevant period Individual-1 interacted with the defendant—whom Indiviudal-1 knew as "Adam." According to Individual-1, the defendant came to Pay-o-Matic frequently over at least a three-year period. During one of those visits, the defendant told Indiviudal-1 that the defendant worked for a car dealership and needed money orders to purchase cars; that, of course, was a lie. The defendant and his sons would thereafter randomly come into Pay-o-Matic to pick up money orders from Individual-1. The defendant paid Indiviudal-1 $200 for every $20,000 of money orders Indiviudal-1 printed for the defendant. Individual-1 would print those money orders in batches of $2,900 to avoid having to collect identification from the purchaser—in this case, the defendant and his sons.

In addition, on or about August 2, 2022, law enforcement officers involved in this investigation interviewed the defendant about his suspected illegal money transfer business. During that interview, the defendant lied to the officers about his criminal activity. For example, the defendant told the agents that he owned a tobacco business in New Jersey, that he used the money counter depicted above for that business, that the ledger found on the Cellphone was for that business, and that he knew nothing about *hawala* and never engaged in *hawala* transactions.

### B. Guilty Plea and Guidelines Calculation

On or about January 15, 2025, the defendant pleaded guilty to Count One of the Indictment pursuant to a plea agreement. In the PSR, the Probation Department concurs with the parties' Guidelines calculations, and recommends that the Court sentence the defendant principally to 30 months' imprisonment. The defendant requests a sentence of time served.

## II. Discussion

### A. Applicable Law

The Sentencing Guidelines provide strong guidance to sentencing courts after *United States v. Booker*, 543 U.S. 220 (2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49.

After making that calculation, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and sets forth seven specific considerations:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established [in the Guidelines];
>
> (5) any pertinent policy statement [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (quotations omitted)).

### B. The Court Should Impose a Sentence At the Bottom of the Guidelines Range

The 3553(a) factors weigh in favor of a sentence of 57 months' imprisonment, which is the bottom of the Guidelines range. Such a sentence would be sufficient, but not greater than necessary, to serve the purposes of sentencing.

*First*, a sentence of 57 months' imprisonment is necessary to reflect the seriousness of the defendant's conduct and to provide just punishment for his offense. The defendant participated in a vast and sophisticated illegal money transfer scheme over a four-year period. That scheme entailed the defendant and his co-conspirators illegally transferring more than $65 million between the United States and other countries, in particular, other countries in the Middle East. The defendant, himself, was involved in illegally transferring approximately $43 million of that more than $65 million and personally profited in the amount of over $400,000. He also took significant steps to hide his conduct from law enforcement including by obstructing this investigation by lying to law enforcement officers during an interview.

Individuals use underground money transmitters like the defendant because they are cheaper, swifter, and more anonymous than the formal banking system. Unlike a traditional bank transfer such as a wire transfer, there are no official records of these illegal transfers, and it is difficult to trace the original source of the money. As the defendant did here, illegal money transmitters often collect funds from their customers in cash or money orders and then move the funds through shell companies to disguise the source and nature of the funds involved in the transaction. Because of those attributes, networks like the defendant's are often used by money launderers and other criminals to transfer criminal proceeds. *See, e.g.*, Dina Habjouqa and Joanna Clendinning, "Hawala: Ancient Money Transfer System Poses Modern Risk," Dow Jones, https://www.dowjones.com/professional/risk/resources/risk-blog/hawala-risks (Last Accessed: April 4, 2025) ("The system also can be exploited for money laundering by discretely introducing criminal funds into the financial system, manipulating them to appear legitimate and making them available for further use. At each stage of the process, Hawala erodes the dirty money trail."); FATF Report, "The Role of Hawala and Other Similar Service Providers in Money Laundering and Terrorist Financing," The Financial Action Task Force, October 2013, https://www.fatf-gafi.org/content/dam/fatf-gafi/reports/Role-of-hawala-and-similar-in-ml-tf.pdf.coredownload.pdf (Last Accessed: April 4, 2025) (same). Accordingly, a significant sentence is required to account for the seriousness of this offense.

To minimize his own culpability, however, the defendant argues that there is no evidence that the transactions that he engaged in as part of this scheme involved criminal proceeds. (*See, e.g.*, Def. Submission at 16). That is not entirely true. While there is no direct evidence establishing that the money involved in a specific transaction was criminal proceeds (which, of course, of not an element of this crime), there is circumstantial evidence that the defendant and his co-conspirators were engaged in money laundering. For example, in or about February and March 2022, Al-Zubaidi conducted specific Google searches for things like (i) "Shaker Hauter," (ii) "fbi is investigating a money laundery [sic] network in nyc," and (iii) "fbi is investigating arab money laundering network." (PSR ¶ 25(c)). In addition, the defendant himself went to great lengths to disguise his own illegal activity—including lying to and bribing a Pay-o-Matic employee to obtain structured money orders under a false name and business. And the defendant's own interactions with specific customers—including certain customers' requesting cash in large denominations or directing the defendant to use the cash he obtained from them to pay for cars at auction, which were to be shipped abroad on their behalf—were tell-tale signs of money laundering.

But even if there was no evidence that some of the money at issue here came from other crimes, that would not be a surprise; in fact, that is one of the salient features of hawala networks. A central purpose of hawala networks is to obscure the nature and origin of the money transfers so as to make them appear legitimate when, in reality, they could be criminal in nature and, thereby, to frustrate law enforcement's ability to detect underlying criminal activity. The very existence of these networks creates a mechanism that criminals can use to circumvent the traditional banking system and the safeguards it has in place to detect or prevent exploitation by criminal organizations. Accordingly, the defendant's participation in this hawala network perpetuated a system that is routinely exploited by criminals and, therefore, his illegal money transfer business—whether it was in fact used by criminals or not—is extremely serious conduct warranting a substantial sentence.

*Second*, a 57-month sentence is also necessary to afford adequate deterrence and to protect the public. For all the same reasons described above—including that they are easily exploitable by other criminals and, by their very nature, perpetuate underground financial transactions that circumvent important financial regulations—illegal money transmitting schemes like the one at issue here present a significant risk to the public. They are also very difficult to detect and dismantle. Accordingly, the cost-benefit analysis for the defendant and others contemplating similar schemes may tip in favor of using similar methods to move millions of dollars across borders, absent a significant prison sentence in this case.

*Finally*, the defendant offers several mitigating arguments that, in his view, warrant a substantially below-Guidelines sentence of time served. None of those arguments, however, justify a sentence below the bottom of the Guidelines.

First, the defendant argues that his criminal conduct did not "ma[ke] him wealthy or was used to fund lavish expenditures." (*See, e.g.*, Def. Submission at 3, 16). That is demonstrably false. As described above, the defendant made over $400,000 in commissions from this scheme and used some of that money to, among other things, purchase a Cadillac, renovate his home, and open other businesses.

Second, the defendant suggests that he engaged in illegal money transfers only to help Yemeni immigrants repatriate money to Yemen in the face of a civil war, (*see, e.g.*, Def. Submission at 3, 11-16), and that he was selective about who he worked with and vetted his transactions to avoid assisting criminals, (*see* Def. Submission at 15). Again, both of those statements are false. The defendant illegally transferred money for many people who were not Yemeni and to destinations that were not Yemen. Several examples of the full scope of the defendant's conduct are described above and include transfers to, from, or the benefit of those from Jordan, Dubai, Turkey, Iraq, Iran, China, Malaysia, and Russia, among others. And, while the defendant did transfer money for Yemeni expatriates he knew from his neighborhood, the defendant frequently did business for clients he did not know and purposefully did not investigate the source of their money or their intentions. In fact, the defendant expressly told the Government that he rarely asked clients what they did or where the money came from; instead, he simply collected the money and passed it on to someone else.

Third, the defendant suggests that his Guidelines range is overinflated and, therefore, should be discounted, because he did not "steal $65 million from someone," (Def. Submission at 16), but that misses the point entirely. In an illegal money transmitting scheme such as this, the loss amount is a very strong indicator of the moral seriousness of the offense and the need for deterrence. The importance of the defendant's criminal conduct—which was the perpetuation of an illicit and exploitable underground financial system—was tied entirely to the amount of money he could move in that system. In fact, the defendant needed to engage in wide ranging criminal conduct—bribing cashiers, sending money through Al-Zubaidi's shell companies, and engaging

in surreptitious money drops with co-conspirators, to name a few—all because he was trying to illegally transfer tens of millions of dollars.[2]

Fourth, the defendant argues that he should receive a significantly-below-Guidelines sentence because he spent seven months in the Metropolitan Detention Centner ("MDC") and, while there, was assaulted and threatened by other inmates because of his criminal conduct. (Def. Submission at 21-24). The Government is sympathetic to the fact that the defendant was attacked and threatened while incarcerated at the MDC; nobody should have to endure that kind of conduct. But, from what the Government understands, the MDC and the United States Marshal Service ("USMS") were not complacent in the face of the harm experienced by the defendant. After the first incident, the MDC moved the defendant to a different housing unit to help protect him. Then, after the second incident, this Office contacted the USMS who then transferred the defendant to Hudson County Correctional Facility where he has remained without incident, as far as the Government is aware. Ultimately, while the time the defendant spent at MDC was difficult, it does not justify a sentence of time-served in this case, given all the vital 3553(a) factors described above.

Fifth, the defendant argues that his family has suffered while he has been in prison and would continue to suffer if he were sentenced to a term of imprisonment longer than time served. The Government is also sympathetic to the difficulties the defendant's family has endured because of his crimes but does not agree that those hardships justify a time-served sentence. Principally, the harm the defendant's family is suffering is the direct result of his own selfish actions. He engaged in this crime out of greed and made victims out of his own family. The suffering he exposed his family to, while deeply tragic, cannot be a reason to reduce his sentence. Moreover, the defendant included at least one of his own sons in his criminal scheme: the defendant used one of his sons to help pick up cash for illicit transfers, to communicate with co-conspirators, and to obtain fraudulent and structured money orders, among other things. Those actions are aggravating factors, not mitigating ones.

In sum, a sentence at the bottom of the Guidelines would account for the seriousness of the defendant's crime, provide just punishment, afford adequate deterrence, and help protect the public from further crimes of the defendant while, by contrast, a sentence of time-served would undermine the purposes of sentencing.

---

[2] With respect to the allegedly comparable cases cited by the defendant as a reason for the Court to impose a significantly below-Guidelines sentence, (Def. Submission at 19-21), it is notable that two of the three cited cases involved substantially less loss amount than is at issue here. The defendant also fails to engage in any particularized discussion of those cases that would in any way prove why these cases are relevant comparators. In contrast, the one case he cites that involves a similarly significant loss amount (albeit a larger loss amount), resulted in a sentence of 42 months' imprisonment. Again, it is not clear from the defendant's discussion of even that case what mitigating factors, if any, were present; nor does he address the substantial aggravating factors present here, including, for example, his lies to law enforcement during the scheme.

### III. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence at the bottom of the applicable Guidelines range of 57 to 60 months' imprisonment.

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York

by: _____
Matthew J. King
Amanda Weingarten
Assistant United States Attorneys
(212) 637-2384

Cc: Tillman Finley, Esq. (By ECF)